# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kathleen Radcliffe,                     Civil No. 11-CV-3701 (SRN/TNL)


      Plaintiff,                     MEMORANDUM OPINION
                                       AND ORDER

v.

Securian Financial Group, Inc.,

      Defendant.

_____

Barbara Jean Felt, Clayton D. Halunen, and Ross D. Stadheim, Halunen & Associates, 1650 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, for Plaintiff

David M. Wilk, Angela Beranek Brandt, and Melissa M. Weldon, Larson King, LLP, 30 East Seventh Street, Suite 2800, Saint Paul, Minnesota 55101, for Defendant
_____

SUSAN RICHARD NELSON, United States District Court Judge

      This matter is before the Court on Defendant's Partial Motion to Dismiss Counts Two Through Seven [Doc. No. 16].  For the reasons set forth herein, Defendant's Motion is granted, and portions of Counts Two through Five are dismissed, and Counts Six and Seven are dismissed in their entirety.

## I.      BACKGROUND

      Plaintiff Kathleen Radcliffe was hired by Defendant Securian Financial Group, Inc. ("Securian") as an Investment Accounting Manager in 2000 and is currently an inactive employee.  (Compl. ¶¶ 12, 47 [Doc. No. 1-1].)  During most of her active tenure

at Securian, Dave LePlavy supervised Radcliffe.  (Id. ¶ 2.)  Plaintiff alleges that Securian received numerous complaints about LePlavy's abusive treatment of female employees and had once required him to attend an internal "charm school" to work on managing employees better.  (Id. ¶¶ 18-19.)   Plaintiff alleges that when one woman left the company in 1999, she cited LePlavy as the reason for her departure.  (Id. ¶ 20.)

Plaintiff contends that, despite receiving regular promotions, commendations and competing job offers, LePlavy created a hostile work environment that led to Plaintiff's severe depression and, ultimately, her termination, or, alternatively, her constructive discharge.  (Id. ¶¶ 2, 51-52.)   Radcliffe also has a medical history of lupus, fibromyalgia and polyarthritis.  (Id. ¶¶ 1, 14.)   However, she alleges that her disabilities did not interfere with her career until late 2008.  (Id. ¶ 14.)

After Plaintiff had worked for Securian for approximately three years, she received a job offer from the St. Paul Travelers Company in 2003.  (Id. ¶ 15.)  Securian presented a counteroffer, which Radcliffe accepted, leading to her promotion to Fund and Investment Accounting Manager.  This position required Radcliffe to be routinely on call and offered little time off.  (Id.)   In 2006, Radcliffe pursued other employment options, leading to a job offer from Assurant.  (Id. ¶ 16.)  Plaintiff alleges that Securian matched Assurant's offer, provided her with additional time off, "and assured Plaintiff that no negative responses would be had if additional time off were requested."  (Id.)   Plaintiff further alleges that after she received the offer from Assurant, LePlavy requested that Plaintiff write a note to Securian's Chief Financial Officer Warren Zaccaro, stating that she did not

want to leave Securian on account on LePlavy, that she liked working for him, and that he was not the reason she sought to leave Securian. (Id. ¶ 17.) Plaintiff alleges that she wrote the note, as requested. (Id.)

In 2007 or 2008, Plaintiff alleges that LePlavy told her that he enjoyed the fact that he no longer had more women working for him and that Plaintiff was the only woman he could not reduce to tears. (Id. ¶ 21.) Plaintiff contends that, at the time, her health worsened. (Id.) She alleges that she informed Defendant of these developments and expressed a need to take time off. In response, Radcliffe contends that Defendant told her that she could use her accumulated vacation time as sick days. (Id. ¶ 22.) Plaintiff was unaware of the Family and Medical Leave Act ("FMLA") and Securian did not advise her that she could take leave under the Act. (Id.) Instead, she used her vacation time as sick days, missing only a few days a month initially. (Id.) As her health deteriorated, she alleges that she eventually missed a day of work per week. (Id.) Nevertheless, Radcliffe contends, her time off was within the amount of accumulated vacation days. (Id.)

Plaintiff alleges that her performance reviews indicated that she "exceeded expectations." (Id. ¶ 23.) Upon her ten-year anniversary with the company, Radcliffe's achievements were lauded, including work in the expansion of Securian's products and services and the adoption of changes in accounting practices. (Id. ¶ 30.)

Plaintiff alleges that while her health problems continued into the next year, Defendant still did not suggest FMLA leave. (Id.) Rather, Plaintiff contends that she

asked for an accommodation, to include a flexible work schedule, but was refused.  (Id. ¶ 24.)  She alleges that "LePlavy even told her that working from home did not count and that her vacation time would be deducted for a full eight hours for everyday [sic] she worked from home."  (Id.)   Radcliffe contends that because fatigue is a symptom of her diseases, she required almost constant rest on the weekends in order to prepare for the following week and to avoid taking any working sick days.  (Id. ¶  26.)

In 2009, Plaintiff was promoted to the position of Director of Fund and Investment Accounting and continued to report directly to LePlavy.  (Id. ¶ 18.)  Plaintiff contends that the day after Thanksgiving 2009, she was working on a large project with a short deadline.  (Id. ¶ 25.)  Because of the holiday, Plaintiff had brought her niece into work with her.  (Id.)  Radcliffe contends that LePlavy belittled and harassed her in front of her niece.  Further, Radcliffe contends that LePlavy threw a ruler at her and told her not to leave the office until she had reviewed a particular document.  (Id.)  Plaintiff also alleges that LePlavy further indicated that he would get back to Radcliffe and her staff with instructions about the project.  Instead, Plaintiff alleges that he left the office without providing the instructions and without informing her of his departure.  (Id.)  Radcliffe alleges that the following week, Securian's CFO Zaccarro told LePlavy, in Plaintiff's presence, that Radcliffe "sure makes LePlavy look good," in reference to the work she had just completed on the project.  (Id. ¶ 27.)

Plaintiff further alleges that LePlavy erected communication barriers between them, to the point of making it impossible for Radcliffe to complete her job tasks on time.

4

(Id. ¶ 28.)  She contends that LePlavy would also make fun of her slow gait, complain about her work and "constantly compare her to employees without health concerns or disabilities."  (Id.)  Radcliffe alleges that LePlavy's behavior contributed to her worsening condition, compounding her levels of stress and depression.  (Id.)  She contends that she developed thoughts of suicide.  (Id. ¶ 29.)

In early 2010, Plaintiff sought assistance from Securian's Human Resources employee Melvin Collins to deal with the situation with LePlavy.  (Id. ¶ 31.)  Collins allegedly stated that he would take Radcliffe's concerns to Kathy Pinkett, the Senior Vice President of Human Resources.  (Id.)  After Radcliffe heard nothing for several weeks, she spoke with Collins.  Plaintiff alleges that "Collins informed her that Pinkett was too busy to do anything about her situation or any other issues regarding LePlavy" and nothing was done.  (Id.)  Plaintiff alleges that she therefore confronted LePlavy herself, and the situation temporarily improved.  (Id. ¶ 32.)  Radcliffe next met with Defendant's Chief Compliance Officer, Nancy Swenson, who, Plaintiff alleges, discussed the situation with Pinkett in Human Resources.  (Id. ¶ 33.)

Plaintiff alleges that after several weeks went by with no response, she utilized Securian's Employee Assistance Program.  (Id. ¶¶ 33-34.)  Radcliffe contends that after she told them about her difficulties with LePlavy, the Employee Assistance staff told her that they could offer no help.  (Id. ¶ 34.)

In the summer of 2010, Plaintiff alleges that two occupational health nurses confronted her, informing her that she was in violation of company policy regarding sick

leave.  (Id. ¶ 35.)  Radcliffe alleges that when she explained that Defendant had instructed her to use her vacation days as sick days, she was finally informed of the FMLA and was offered relief under its provisions.  (Id.)  Plaintiff further alleges that LePlavy conceded that they "messed up" and that Plaintiff should have been on FMLA leave in the past. (Id.)

Radcliffe thereafter took leave under the FMLA and alleges that she worked approximately 75% of her normal hours from home.  (Id. ¶ 36.)  She alleges that she answered emails, phone calls, and couriered documents from her home to Defendant and other businesses while on FMLA leave.  (Id.)

In August 2010, Plaintiff met with Occupational Health Nurse Barb Warner, who suggested that Plaintiff meet with Securian's in-house Occupational Health Physician, Dr. Battis.  (Id. ¶ 38.)  Radcliffe met with Battis on August 16, 2010.  (Id. ¶ 38.)  They discussed Plaintiff's situation during the meeting and Dr. Battis also phoned Plaintiff's regular physician.  (Id.)  Plaintiff alleges that after that conversation, Dr. Battis directed Plaintiff to United Hospital in order to meet with a social worker and physician to formulate a treatment plan.  (Id.).  However, Plaintiff alleges, Battis and Warner instead took her to United Hospital's mental health ward, where Radcliffe was involuntarily committed.  (Id.)  There, Plaintiff contends that she was placed on a 72-hour lockdown and was subjected to a strip search, against her will.  (Id.)  Radcliffe contends that the event embarrassed and humiliated her and contributed to her depression.  (Id.)  She asserts that she was released a day and a half early, after pleading with doctors and staff.

(Id.)

Following this incident, Radcliffe obtained a doctor's note to return to work and did so the following day. (Id. ¶ 39.) She alleges that, once there, Defendant required her to present a doctor's note specifically from a psychologist. Plaintiff further alleges that Occupational Health Nurse Cindy Scott locked her out of the building and that her computer rights were suspended. (Id.) Radcliffe alleges that she obtained the note and returned to work.

Upon returning to work with the psychologist's note, Plaintiff contends that Scott and Collins presented her with two options: (1) take a leave of absence; or (2) return to work with no more than six unplanned absences for any reason, for the rest of the year. (Id. ¶ 40.) Plaintiff alleges that if she chose the second option, and missed more than six days, she would be placed under disciplinary review, with the option of Defendant terminating her. (Id.) She contends that Defendant informed her that she had exhausted all of her FMLA leave and that any absences would count as unplanned absences. (Id.) Radcliffe chose the second option. (Id.)

Plaintiff alleges that in October 2010, Securian demoted her. (Id. ¶ 42.) While her title and pay did not change, she contends that a number of her responsibilities were removed. (Id.) Radcliffe alleges that she understood that her pay and job duties would be reevaluated in six months' time. (Id.) Her new supervisor, Peter Berlute, was younger and less experienced. (Id.)

On November 16, 2010, Plaintiff's personal physician, Dr. Mary Loken,

recommended that Plaintiff take an immediate leave of absence due to changes in Plaintiff's health. (Id. ¶ 41.) Plaintiff had expressed increasing feelings of loneliness, depression, and frequent thoughts of suicide. (Id.) Radcliffe took her doctor's advice and began her leave of absence on November 16, 2010. (Id. ¶ 43.) Before doing so, however, Radcliffe checked with Melvin Collins in Human Resources, who, she alleges, told her that Radcliffe's annual bonus and profit sharing would not be affected by her leave of absence. (Id.)

Plaintiff contends that, contrary to Collins' assurances, she never received her 2010 bonus. (Id. ¶ 44.) When she inquired into the matter in February 2011, Plaintiff alleges that Berlute returned her call and LePlavy was also on the line. (Id.) Radcliffe contends that Berlute informed her that she had done nothing to merit the bonus. (Id.)

Shortly thereafter, Plaintiff alleges that she decided to try to return to work, but her physician recommended that she only work a maximum of four hours per day. (Id. ¶ 45.) Plaintiff contends that she left a message for Berlute, requesting to work four, full days a week, but received no response. (Id.) After receiving no response, Radcliffe contacted Scott, who, she alleges, denied her request. (Id.) Plaintiff subsequently went on long-term disability. (Id.) Plaintiff contends that she is currently an inactive Securian employee. (Id. ¶ 47.) She also alleges that because Defendant denied her request to return to work, she was effectively terminated. (Id. ¶ 48.) Alternatively, Radcliffe asserts that she was constructively discharged. (Id.)

Plaintiff brings seven claims against Defendant: (1) violations of the FMLA, 29

U.S.C. §§ 2601 et seq; (2) disability discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01 et seq.; (3) failure to provide a reasonable accommodation in violation of the MHRA; (4) reprisal discrimination in violation of the MHRA; (5) gender discrimination in violation of the MHRA; (6) negligent supervision and retention; and (7) intentional infliction of emotional distress ("IIED"). In the instant motion, Defendant moves to dismiss all, or portions of, Plaintiff's claims, with the exception of her FMLA claim. Defendant argues that pursuant to Fed. R. Civ. P. 12, Plaintiff's claims in Counts Two-Seven, or portions thereof, fail as a matter of law. As to Plaintiff's claims under the MHRA (Counts Two-Five), Defendant contends that they are barred by the one-year statute of limitations under the Act. Securian also argues that Plaintiff's common law claims for negligence and IIED fail. Specifically, Defendant contends that these claims are preempted by the MHRA or the Worker's Compensation Act ("WCA") and further alleges that they are insufficiently pled.

In response, Plaintiff argues that the continuing violations doctrine – an exception to the statute of limitations – saves her claims under the MHRA. In addition, she contends that her common law claims fall within the assault exception to the WCA's exclusive remedy provision, and are not preempted by the MHRA. She further contends that her common law claims state plausible claims for relief. In the event that the Court finds it necessary, Plaintiff seeks leave to amend her pleadings to correct any deficiencies.

## II.    DISCUSSION

## A. Standard of Review

Defendant brings a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Def's Mot. [Doc. No. 16]) (arguing that Plaintiff has failed to state a claim upon which relief can be granted and that the motion "is brought pursuant to Rule 12.") Plaintiff argues, however, that Securian filed this motion after filing its Answer to the Complaint and therefore, Defendant's motion is procedurally improper. (Pl's Opp'n Mem. at 8, n.1 [Doc. No. 22].)

By its terms, Rule 12(b) provides that a party asserting a defense by motion, including a motion for failure to state a claim upon which relief can be granted, must assert such a defense <u>before pleading</u>, if a responsive pleading is allowed. Fed. R. Civ. P. 12(b) (emphasis added). Technically, therefore, a Rule 12(b)(6) motion cannot be filed after an answer has been submitted. <u>Westcott v. City of Omaha</u>, 901 F.2d 1486, 1488 (8th Cir. 1990).

As a leading treatise observes,

> "A strict interpretation of [this] language leads to the conclusion that the district judge must deny any Rule 12(b) motion made after a responsive pleading is interposed as being too late." 5C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1361 (3d ed. 2004). But as that treatise also observes, as long as the defense of failure to state a claim has been asserted in the answer, federal courts routinely consider defendants' post-answer motions raising the defense "although technically they are no longer Rule 12(b) motions." <u>Id.</u>

<u>Great Lakes Gas Transmission Ltd. P'ship Five. Essar Steel Minn., LLC</u>, __ F. Supp.2d __, No. 09-CV-3037 (SRN/LIB), 2012 WL 1694595, *4-5 (D. Minn. May 15, 2012)

(quoting <u>Ali v. Frazier</u>, 575 F. Supp.2d 1084, 1089 (D. Minn. 2008)).

In <u>Ali</u>, this Court treated the moving party's Rule 12(b)(6) motion to dismiss for failure to state a claim as a Rule 12(c) motion asserting the same argument. <u>Id.</u> at 1089-90 (citing <u>Westcott</u>, 901 F.2d at 1488). A motion for judgment on the pleadings brought pursuant to Rule 12(c) may be brought "after the pleadings are closed - but early enough not to delay trial. . . ." Fed. R. Civ. P. 12(c). "As the Eighth Circuit held in <u>Westcott</u>, because motions to dismiss for failure to state a claim are subject to the same legal standard whether brought under Rule 12(b)(6) or Rule 12(c), the distinction is 'purely formal . . . .'" <u>Ali</u>, 575 F. Supp.2d at 1089 (citing <u>Westcott</u>, 901 F.2d at 1488).

While Securian did not expressly assert a Rule 12(b)(6) defense in its Answer, it did cross-reference its Motion to Dismiss in its responses to Counts Two through Seven of the Complaint, stating, e.g., "Plaintiff's Count Two is the subject of a motion to dismiss and, in any event, Securian denies the allegations . . . ." (Answer ¶ 58 [Doc. No. 4].) Securian originally filed its Motion to Dismiss on the same day that it filed its Answer. (<u>See</u> Original Motion to Dismiss - Filed in Error [Doc. No. 6].) While the docket reflects that the original Motion to Dismiss was filed in error and would be re-filed at a later date, Defendant sought dismissal under Rule 12 for failure to state a claim, or, in other words, Rule 12(b)(6).

Given the preference to decide legal issues on the merits, the Court will not refuse to consider Defendant's motion because it was styled as a Rule 12(b)(6) motion. Assuming for the sake of argument that Securian had simply filed its Answer and original

Motion to Dismiss in reverse order, there would be no procedural infirmity. In light of these factors – the specific procedural circumstances of this case, the identical standard of review applicable under the two rules, and the Eighth Circuit's recognition of a "purely formal" distinction between the rules – the Court will consider Plaintiff's motion on the merits. This approach is consistent with this Court's ruling in <u>Great Lakes</u>, __ F. Supp.2d at __, 2012 WL 1694595 at *4-5, and in other rulings made, albeit in passing, by this Court, <u>see</u> <u>E.E.O.C. v. Northwest Airlines</u>, 216 F. Supp.2d 935, 937 (D. Minn. 2002), and by other district courts within the Eighth Circuit, see, e.g., <u>Egziabher v. Parks</u>, No. 11-CV-5088, 2012 WL 912933, *1-2 (W.D. Ark. Mar. 16, 2012); <u>Janis v. Nelson</u>, No. 09-CR-5019-KES, 2009 WL 5216902, *2, n.2 (D. S.D. Dec. 30, 2009); <u>Woods v. St. Louis Justice Center</u>, No. 4:06-CV-233 CAVES, 2006 WL 2990240, *1 (E.D. Mo. Oct. 18, 2006).

When evaluating a motion to dismiss under Rule 12(b)(6) or 12(c), the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. <u>Morton v. Becker</u>, 793 F.2d 185, 187 (8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations, <u>Hanten v. Sch. Dist. of Riverview Gardens</u>, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled. <u>Westcott</u>, 901 F.2d at 1488.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

545 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  Id. at 555.  As the United States Supreme Court recently stated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citing Twombly, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  Twombly, 550 U.S. at 556.  Here, the Court will not consider evidence outside of the pleadings, and therefore confines its analysis to Plaintiff's Complaint.

**B.      Plaintiff's Claims Under the MHRA**

Under the MHRA, claims of unfair discriminatory practice must be filed within one year of the occurrence of the alleged discriminatory practice.  Minn. Stat. § 363A.28, subd. 3.  Plaintiff filed the instant suit in Minnesota state court on December 6, 2011.  Under the statute of limitations, allegedly discriminatory practices occurring prior to December 6, 2010 are time-barred, but for any applicable exception to the statute.  One such exception is the continuing violation doctrine, which allows a plaintiff to toll the expiration of the statute of limitations where a continuing pattern forms due to discriminatory acts occurring over a period of time, "'as long as at least one incident of discrimination occurred within the limitations period.'"  Taxi Connection v. Dakota, Minn. & E. R.R. Corp., 513 F.3d 823, 825 (8th Cir. 2008) (citing Sigurdson v. Isanti Cnty., 448 N.W.2d 62, 66 (Minn. 1989)).  The challenged actions that fall outside of the

statute of limitations must be <u>related to</u> violative acts which occurred within the statutory period.  <u>Smith v. Ashland</u>, Inc., 179 F. Supp.2d 1065, 1069 (D. Minn. 2000) (emphasis added), <u>aff'd</u>, 250 F.3d 1167 (8th Cir. 2001);  <u>Mandy v. Minn. Mining & Mfg.</u>, 940 F. Supp. 1463, 1468 (D. Minn. 1996).   Even though discriminatory acts may have continuing consequences, the discriminatory acts must be "more than the mere consequences of past discrimination," and the Court's focus must be upon the "time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful."   <u>Treanor v. MCI Telecomm'cns Corp.</u>, 200 F.3d 570, 574 (8th Cir. 2000).

The continuing violation doctrine does not apply to discrete discriminatory acts, such as termination, failure to promote, denial of transfer, or refusal to hire, which are considered individually actionable.  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113-14 (2002) (addressing continuing violation doctrine for Title VII claims); <u>Tademe v. Saint Cloud State Univ.</u>, 328 F.3d 982, 988 (8th Cir. 2003) (applying <u>Morgan</u>, and finding the plaintiff's claims of discrimination were barred by the statute of limitations).[1]  "A continuing violation must be either a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system or policy during the limitations period and before."  <u>Koren v. Supervalu, Inc.</u>, No. 00-CV-1479 (ADM/AJB), 2003 WL 1572002, *9 (D. Minn. March 14, 2003) (citing <u>Mandy</u>, 940 F. Supp. at 1468).  Courts must look to whether a present violation exists, rather than to

_____

[1]  In deciding issues of continuing violation, Minnesota courts have looked to Supreme Court guidance in Title VII cases.  <u>Sigurdson</u>, 448 N.W.2d at 67.

whether continuing effects from earlier acts exist.  <u>Kohn v. City of Minneapolis Fire</u>

<u>Dep't</u>, 583 N.W.2d 7, 11 (Minn. Ct. App. 1998) (citing <u>United Air Lines, Inc. v. Evans</u>,

431 U.S. 553, 558 (1977)).

Plaintiff alleges two actions falling within the statutory period, both of which

occurred in February 2011: (1) the phone conversation with Berlute, with LePlavy

listening in, during which Radcliffe was told that she had done nothing to earn a 2010

bonus; and (2) Securian's refusal to grant Radcliffe's request to return to work four days

per week.  (Compl. ¶¶ 44-45 [Doc. No. 1-1].)   The portion of Defendant's Motion to

Dismiss related to the MHRA claims is limited to only those allegations falling outside of

the statute of limitations.  (Def's Mem. at 3 [Doc. No. 18]) (stating, "Counts Two through

Five fail to the extent plaintiff seeks relief for discrete acts of alleged discrimination or

retaliation that occurred outside of the one year statute of limitations set forth in the

Minnesota Human Rights Act.")  At the motions hearing, counsel for Defendant

confirmed the scope of Defendant's motion and conceded that the allegations occurring in

February 2011fall within the statute of limitations.   The Court therefore addresses the

applicability of the continuing violations doctrine to Radcliffe's claims of disability and

gender discrimination, failure to accommodate, and reprisal discrimination under the

MHRA that fall outside of the statutory period.  In addition, while Plaintiff does not plead

a separate cause of action for hostile work environment, because her general allegations

refer to a hostile work environment (<u>see</u>, <u>e.g.</u>, Compl. ¶¶ 2, 44 [Doc. No. 1-1]), the Court

examines the continuing violation doctrine with respect to claims of a hostile work

environment as well.

### 1. Disability Discrimination

In support of her claim for disability discrimination, Plaintiff alleges that Defendant "discriminat[ed] against her because of her disability; involuntarily committ[ed] her to a mental ward without merit; alter[ed] the terms and conditions of her employment; and withh[eld] her 2010 bonus that she rightly earned." (Compl. ¶ 58 [Doc. No. 1-1].) She also alleges that Securian denied her request to return to work four days per week and constantly subjected her to demeaning comments, making it difficult for her to perform her job. (Id. ¶¶ 61, 64.) Of these alleged acts, the act of withholding the 2010 bonus and the denial of the request to return to work on a part-time basis fall within the statutory period, as noted, and remain actionable.

While the continuing violations doctrine is most frequently addressed in the context of hostile work environment claims, where the discriminatory practice may consist of many acts not individually actionable, Taxi Connection, 513 F.3d at 825, courts have also considered the continuing violation doctrine in the context of disability discrimination cases under the ADA. Treanor, 200 F.3d at 574 (affirming finding of no continuing violation where two individual instances of alleged failure to accommodate were separated by two years and were unconnected by any intervening acts of discriminatory contact); Connor v. Reckitt & Coleman, Inc., 84 F.3d 1100, 1102 (8th Cir. 1996) (finding no continuing violation because the plaintiff was no longer an employee at the time of the employer's refusal to accommodate).

Regarding the actions occurring outside of the limitations period, Plaintiff's allegation that Defendant "discriminat[ed] against her because of her disability" (id. ¶ 58) is the type of vague and conclusory allegation that does not pass muster under Iqbal and Twombly, absent reference to a specific act of discrimination.  This allegation cannot support Radcliffe's disability discrimination claims that fall outside of the statutory period.  Similarly, Plaintiff contends that Defendant altered the terms and conditions of her employment, without providing greater specificity.  (Compl. ¶ 58 [Doc. No. 1-1].)  Because this conclusory allegation lacks sufficient detail, it also fails under Iqbal and Twombly.  To the extent that "altering the terms and conditions of her employment" refers to Radcliffe's alleged demotion in 2010, the continuing violations doctrine is inapplicable.  The Supreme Court's ruling in Morgan makes clear that a separate violation may not form the basis of a continuing violation theory.  536 U.S. at 111.  Demotion constitutes a discrete, separate act.  See Garcia v. Centerpoint Energy Resources Corp., No. 1:10-cv-54-DPM, 2012 WL 892278, *2 (E. D. Ark. Mar. 15, 2012) ("Like termination or failure to promote, demotion is a discrete act," actionable when committed) (citing Morgan, 536 US. at 113-14); Goliday v. GKN Aerospace-St. Louis Aerospace, No. 4:11CV-729 JCH, 2011 WL 3847411, *2, n.1 (E.D. Mo. Aug. 26, 2011) (finding that claims related to demotion could not be saved under a continuing violation theory, as the demotion was a discrete act and not part of any continuing violation).

Regarding her other allegations, the continuing violations doctrine applies "so long as all acts which constitute the claim are part of the same unlawful employment practice

and at least one act falls within the time period." Morgan, 536 U.S. at 122. Plaintiff

urges the Court to apply the Fifth Circuit's test in Berry v. Board of Supervisors of L.S.U.,

715 F.2d 971 (5th Cir. 1983), in determining whether the continuing violation doctrine

applies to toll the statute of limitations. (Pl.'s Opp'n Mem. at 12 [Doc. No. 22].) The

Berry court identified the following three non-exhaustive factors as relevant in its analysis

of whether the continuing violations doctrine applies: (1) whether the acts involve the

same subject matter; (2) the frequency of the acts; and (3) the degree of permanence of

the alleged acts of discrimination; that is, whether an act outside the limitations period

should have triggered the plaintiff's awareness of and duty to assert his or her rights. 715

F.2d at 981. As Plaintiff notes, Minnesota courts, including this Court, have applied the

Berry test, although it has not been formally adopted. See, e.g., Koren, 2003 WL

1572002; Bradley v. American Home Prods. Corp., No. 00-CV-4 (JMR/SRN), 2002 WL

31317393 (D. Minn. Aug. 16, 2002); Bradley v. Hubbard Broadcasting, Inc., 471 N.W.2d

670, 676 (Minn. Ct. App. 1991).

However, the Berry test, "which, among other things, takes into account . .

.whether the earlier acts have sufficient permanency to trigger the employee's awareness

of and duty to challenge the alleged violation," Morgan, 536 U.S. at 107, n. 3, was called

into question by the Supreme Court in Morgan. Id. at 117–18 (observing, "[i]t is

precisely because the entire hostile work environment encompasses a single unlawful

employment practice that we do not hold, as have some of the Circuits, that the plaintiff

may not base a suit on individual acts that occurred outside the statute of limitations

18

unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct.")   Rather, "in determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   <u>Id.</u> at 116 (internal quotations omitted).

The Court finds that the alleged acts – involuntarily committing Plaintiff to a mental ward after consulting with her treating physician in August 2010 (Compl. ¶ 38 [Doc. No. 1-1]), making demeaning comments about Plaintiff's disabilities, and cutting off communication in 2009 (<u>id.</u> ¶ 28) – do not constitute a continuing violation, under either <u>Morgan</u> or <u>Berry</u>.   As to the allegations regarding Plaintiff's involuntarily commitment, this allegation would appear to fall into the category of "discrete acts," such that this claim would arise on the day in question, not over a period of time.   <u>See</u> <u>Morgan</u>, 536 U.S. at 111.   While under <u>Morgan</u>, courts consider whether the complained-of action was humiliating, <u>id.</u> at 116, as Plaintiff alleges the involuntary commitment was, under both <u>Morgan</u> and <u>Berry</u>, courts also consider the frequency of the alleged action, with more frequent action tending to support application of the continuing violation doctrine. <u>See</u> <u>id.</u>; <u>Berry</u>, 715 F.2d at 981.   The involuntary commitment was a one-time occurrence.

The Court concludes that these alleged acts are not related to the two acts falling within the statutory period and are not part of a "systematic repetition of the same policy," nor are they an "integrated pattern." <u>Hubbard v. United Press Int'l, Inc.</u>, 330

N.W.2d 428, 440-41, n.11 (Minn. 1983). Rather, they are temporally distinct actions, some of which involved different actors (e.g., LePlavy and Dr. Battis) and are not similar in nature, frequency, and severity so as to be considered "part and parcel" of a continuing, integrated pattern or policy. Wilkie v. Dept. of Health & Human Services, 638 F.3d 944, 951 (8th Cir. 2011). Because the continuing violation doctrine does not apply to the alleged acts of MHRA disability discrimination falling outside of the statute of limitations, these acts are time-barred and cannot form the basis of Radcliffe's disability discrimination claim. Defendant's motion to dismiss these allegations is therefore granted.

## 2. Failure to Provide Reasonable Accommodation

In Count Three, Radcliffe asserts a claim for failure to provide a reasonable accommodation in violation of the MHRA. In support of this claim, Radcliffe alleges that Defendant, through its managers and officials, "fail[ed] to accommodate [her] disabilities after notice, and forc[ed] her to work through and around her disabilities by not allowing her to work from home, and [did] not otherwise accommodat[e] her disabilities." (Compl. ¶ 68 [Doc. No. 1-1].) In her general allegations, Plaintiff contends that in approximately 2007 or 2008, she asked for a flexible work schedule, but was refused and told that working from home was not possible. (Id. ¶ 24.) Plaintiff also alleges that in 2010, "she needed help," although the Complaint is unclear as to whether this refers to help with an accommodation, or help in intervening with LePlavy, or something else. (Id. ¶ 31.) Radcliffe alleges that she turned to various departments or people at Securian – Human

20

Resources, the Chief Compliance Officer, the Employee Assistance Program – to no avail. (Id. ¶¶ 31, 33-34.) In the summer of 2010, Plaintiff alleges that Securian first informed her of the existence of the FMLA, and she took leave under the Act. (Id. ¶ 35.) Of the two allegations falling within the statute of limitations, Radcliffe's request in February 2011 to work a four-day weekly schedule also appears to form part of the basis for this claim. (Id. ¶ 45.)

The Court finds that the continuing violations doctrine is also inapplicable to the portions of Plaintiff's reasonable accommodation claim that fall outside of the statutory period. While Plaintiff alleges that she requested an accommodation to work from home in approximately 2007 or 2008, and was denied, this Court has held that a denial of a request for accommodation constitutes a discrete act and is not part of a continuing violation. Quasius v. Schwan Food Co., No. 08–CV–575 (JNE/JJG), 2008 WL 4933764, *5 (D. Minn. Nov. 14, 2008) (citing Morgan, 536 U.S. 101, 114 (2002); Cherosky v. Henderson, 330 F.3d 1243, 1248 (9th Cir. 2003) (holding denial of employee's request for an accommodation for a disability under the Rehabilitation Act was a discrete act); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003) (holding denial of request for religious accommodation was a discrete act). Plaintiff's allegations regarding her need for help, which led her to contact various persons and departments at Securian (Compl. ¶¶ 31, 33-34 [Doc. No. 1-1]), also do not sufficiently plead a claim for failure to provide reasonable accommodation. The allegations do not indicate whether Plaintiff made any such requests for accommodation. For all of these reasons, the Court

finds that the portions of Plaintiff's claim for failure to reasonably accommodate falling outside of the one-year statute of limitations are time-barred. Defendant's motion to dismiss is therefore granted with respect to these allegations.

### 3. Reprisal Discrimination

Plaintiff contends that the continuing violation doctrine also applies to her reprisal claim under the MHRA in Count Four of the Complaint. Plaintiff alleges that in October 2010, she was demoted and a number of her job responsibilities were taken away, and in February 2011, her 2010 bonus was withheld, and she was terminated or constructively discharged. (Compl. ¶ 42, 43-45, 73 [Doc. No. 1-1].) Plaintiff contends that Securian's actions in withholding the 2010 bonus and refusing to permit a four-day work week, resulting in her alleged constructive discharge or termination and occurring within the statutory period, are related to the earlier alleged acts.

The Court disagrees and finds that the alleged acts falling outside of the statutory period are not sufficiently related to the alleged acts that occurred in February 2011. As noted, a demotion is considered a discrete act to which the continuing violation doctrine does not apply. Moreover, the Court does not find the removal of a number of Plaintiff's job responsibilities in October 2010 to be an act of the similar type as the acts falling within the statutory provision, i.e., withholding of the 2010 bonus and the refusal to permit Radcliffe to work four days per week. For these reasons, the continuing violation doctrine is inapplicable to these portions of Plaintiff's claim. Defendant's motion to dismiss is granted as it relates to these portions of Plaintiff's reprisal claim.

### 4.    Gender Discrimination

In Count Five of the Complaint, Plaintiff alleges gender discrimination under the MHRA, for which she argues that the continuing violation doctrine applies.  In support of her claim, Radcliffe alleges that Securian took adverse actions against her, created a hostile work environment because of her gender by subjecting her to demeaning comments about her gender, cutting off communication, involuntarily committing her to a mental ward, and, in 2011, terminating her from her employment, or constructively discharging her, and refusing her request to work four days per week.  (Compl. ¶¶ 83, 85-86, 88 [Doc. No. 1-1].)

Again, the Court's focus is on whether the alleged actions that fall outside of the one-year statute of limitations are sufficiently related to the 2011 conduct so as to form a continuing violation, tolling the statute, or whether the acts form part of a discriminatory system or policy during the limitations period and before.  The Court finds that the alleged actions are not sufficiently related, nor do they form part of a system or policy. First, as to the demeaning comments, Plaintiff alleges two specific gender-related comments, which apparently occurred around 2007 or 2008:  (1) that LePlavy informed Radcliffe that he was glad that no other women worked for him; and (2) that LePlavy told Radcliffe that he was not able to reduce her to tears.  (Id. ¶ 21.)   These comments are not sufficiently related to the 2011 within-the-statute conduct concerning Defendant's alleged refusal to provide a 2010 bonus and to allow Plaintiff to work four days a week.   Not only are they unrelated by subject matter, they are also separated in time from the 2011

actions by three to four years. In addition, although the comments are objectionable, they are essentially offensive utterances, as compared to physically threatening or humiliating actions, and do not form part of a continuing violation. See Morgan, 536 U.S. at 116.

Plaintiff's allegation that LePlavy closed off communication in 2009, making it difficult for her to perform her job (id. ¶ 28), also is not related to the actions occurring in 2011 regarding the bonus and refusal to permit a four-day work week, nor can this action, and the 2011 actions, be considered part of a discriminatory system or policy. Under Berry, which looks to whether the actions concern the same subject matter, among other things, 715 F.2d at 981, the closed-off communication in approximately 2009 and the later actions concerning the 2010 bonus and the refusal to permit a four-day work week, do not involve the same subject matter. The Supreme Court's test in Morgan addresses whether the complained-of action unreasonably interferes with the employee's work performance, as Plaintiff alleges here, and the frequency of the action, 536 U.S. at 116, as the Complaint suggests the communication barrier was constant. Additionally, Morgan requires examination into the severity of the action and whether it was physically threatening or humiliating. Id. As to these latter two factors from Morgan, without diminishing the difficulty that Plaintiff experienced, the lack of communication pled here was neither sufficiently severe nor physically threatening or humiliating. On balance, the Court finds that the lack of communication does not support application of the continuing violation doctrine.

Lastly, the allegation concerning Radcliffe's involuntary commitment in August

2010 (id. ¶ 38) contains no reference to gender and is unrelated to the failure to provide a bonus and refusal to permit a four-day work week.   Moreover, as a one-time event, this allegation would appear to fall into the category of discrete acts, such that this claim would arise on the day in question, not over a period of time.   Given that Plaintiff alleges that the involuntary commitment occurred on a single occasion and that the 2011 allegations are unrelated to such hospitalization, the Court finds the August 16, 2010 incident to be a separate, discrete act.[2]

Accordingly, the continuing violations doctrine is inapplicable to toll the statute of limitations for the portions of Plaintiff's gender discrimination claim that fall outside of the statute of limitations.  Defendant's motion to dismiss is therefore granted as it relates to these portions of Plaintiff's gender discrimination claim.

### 5.    Hostile Work Environment

As noted earlier, while Plaintiff has not specifically pled a hostile work environment cause of action, her general allegations refer to a hostile work environment. (Compl. ¶¶ 2, 43 [Doc. No. 1-1].)  The Court therefore addresses the applicability of the continuing violation doctrine to such a claim.  As noted, the denial of the 2010 bonus and

_____

[2] Few cases specifically discuss whether involuntary commitment constitutes a continuing violation.  In Smith v. Shorstein, 217 Fed. Appx. 877, 881 (11th Cir. 2007), a state prisoner challenged his confinement under Florida's law concerning the involuntary commitment of sexual predators.  The court found that the prisoner's causes of action for civil rights violations did not accrue, for statute of limitations purposes, until he was eventually released from the commitment.  The facts of Smith are factually inapposite here, where the involuntary commitment occurred one time, for a 72-hour period, and is unrelated to the Defendant's alleged actions in 2011.

Defendant's refusal to provide Radcliffe with a four-day a week position – actions which occurred in February 2011 – fall within the statutory period. Because Plaintiff was on FMLA leave as of November 16, 2010, Defendant argues that during the statutory period, from December 6, 2010 to December 6, 2011, Plaintiff "did not experience any work environment – hostile or otherwise – during the one year before she filed suit." (Def's Reply Mem. at 4 [Doc. No. 23].) While this is true, the law requires the Court to consider whether the alleged actions within the statutory period are sufficiently related to the alleged actions outside of the statutory period, or whether they demonstrate the maintenance of a discriminatory system or policy during the limitations period and before. Koren, 2003 WL 1572002 at *9.

In her general allegations, Plaintiff alleges the following facts, falling outside of the statutory period, that presumably might support a hostile work environment claim: (1) in 2007 or 2008, LePlavy engaged in "bizarre, overt and hostile behavior (id. ¶ 21); (2) in 2009, LePlavy made fun of Plaintiff's gait, complained about her work, and "constantly compare[d] her to employees without health concerns or disabilities" (id. ¶ 28); (3) in 2010, Dr. Battis took Plaintiff to a hospital mental ward after consulting with her treating physician (id. ¶ 38); and (4) in 2010, she was demoted (id. ¶ 42).

The Court finds that the above-alleged incidents do not constitute a continuing violation sufficient to toll the statute of limitations for purposes of a hostile work environment claim. Again, to the extent that Plaintiff alleges, in support of a hostile work environment claim, that she was demoted, under Morgan, a separate violation may not

26

form the basis of a continuing violation theory, 536 U.S. at 111, and demotion constitutes a discrete, separate act, as this Court noted previously.  See Garcia, 2012 WL 892278 at *2; see also Goliday v. GKN Aerospace-St. Louis Aerospace, 2011 WL 3847411at *2, n.1.  Plaintiff's alleged demotion therefore constitutes a separate, discrete act and is time-barred.

As to the other allegations supporting a hostile work environment claim, the court finds that they are unrelated and not part of a "systematic repetition of the same policy," or an "integrated pattern." Hubbard, 330 N.W.2d at 440-41, n.11.  Instead, they are temporally distinct and not similar in nature, frequency, severity so as to be considered "part and parcel" of a hostile work environment.  Wilkie, 638 F.3d at 951.  As noted in the Court's discussion of Plaintiff's gender discrimination claim, the Court views the allegations concerning the trip to the hospital mental health ward as a separate, discrete act to which the continuing violation doctrine is inapplicable.   It was also an action that occurred on one occasion and was therefore not a repeated action, that became a pattern or practice.

C.    Plaintiff's Common Law Claims

In the Complaint, Plaintiff asserts common law claims of negligent supervision and retention (Count Six) and IIED (Count Seven).  Defendant argues that Plaintiff's claims are preempted by both the exclusivity provision in the Minnesota WCA for personal injuries which arise out of and in the course of employment, and by provisions of the MHRA.  In addition, Securian argues that Plaintiff fails to sufficiently plead prima

facie common law claims for negligent supervision and retention in Count Six and IIED in Count Seven.

### 1. Preemption Under the WCA

Plaintiff alleges in her common law claims that she was personally injured. (Compl. ¶¶ 95, 100 [Doc. No. 1-1].)  The WCA provides that employers "are liable to pay compensation in every case of personal injury. . . of an employee arising out of and in the course of employment without regard to the question of negligence." Minn. Stat. § 176.021, subd. 1; Meintsma v. Loram Maint. of Way, Inc., 684 N.W.2d 434, 438 (Minn. 2004).  The employer's liability to pay worker's compensation "is exclusive and in place of any other liability." Minn. Stat. § 176.031.  Thus, the WCA provides the exclusive remedy to employees for personal injuries arising out of and in the course of employment. Id.; McGowan v. Our Savior's Lutheran Church, 527 N.W.2d 830, 833 (Minn. 1995). When the WCA provides the employee's exclusive remedy, a district court is without subject-matter jurisdiction unless the employee can show that the alleged conduct falls within an exception to WCA exclusivity.  Stengel v. East Side Beverage, 690 N.W.2d 380, 383 (Minn. Ct. App. 2004).

Plaintiff argues that such an exception applies, asserting that her negligence claim is not barred under the "assault exception" to WCA exclusivity.  (Pl's Opp'n Mem. at 16-20 [Doc. No. 22]) (citing Minn. Stat. § 176.011, subd. 16).  As noted, if an employee suffers a personal injury or death arising out of and in the course of her employment, the Act provides the employee's exclusive remedy.  Minn. Stat. § 176.031.  However, in

defining the phrase "personal injury," the WCA includes an "assault exception" to the Act's default exclusivity, providing that "[p]ersonal injury does not include an injury caused by the act of a third person or fellow employee intended to injure the employee because of personal reasons, and not directed against the employee as an employee, or because of the employment."  Minn. Stat. § 176.011, subd. 16.   Under those circumstances, such claims are not subject to the WCA's exclusivity provision.

In the context of the WCA's exclusivity provision, the Minnesota Supreme Court has identified three categories of assault cases.  The first two categories of assault cases are only compensable under the WCA, and are therefore subject to the Act's exclusivity provision: (1) when the provocation or motivation for the assault arises solely out of the activity of the victim as an employee; or (2) when the assault was random and neither directed against the victim as an employee nor for reasons personal to the employee. McGowan, 527 N.W.2d at 834 (holding that the assault exception did not apply to the rape of a female director of a homeless shelter because being in isolated places with male clients was both a potential job duty and a "causal factor"); see also Meintsma, 684 N.W.2d at 439 (holding that the assault exception did not apply to a birthday spanking administered by co-workers "during working hours in the workplace because all employees were spanked on their birthdays and the spanking was not personally motivated.").  The final category of assault, which is outside of the WCA's exclusivity provision, as noted above, occurs if the assailant is motivated by personal animosity toward the victim, arising from circumstances wholly unconnected with the employment.

McGowan, 527 N.W.2d at 834; Mehl v. Portaco, Inc., No. 11-CV-36 (RHK/LIB), 2012 WL 1593215, *7-8 (D. Minn. May 7, 2012) (finding assault exception applied where plaintiff's duties as a welder put her at risk for groping, employer had no policy condoning such conduct, and individual defendant's actions were personal, having no association with plaintiff's duties as a welder). Thus, the assault exception applies in situations where there is some prior relationship between the assailant and victim and does not apply when the victim is chosen at random or is targeted because of her status as an employee. B.E.M. v. Bridgeman's Restaurants, Inc., No. C8–96–2187, 1997 WL 161852, *3 (Minn. Ct. App. April 8, 1997).

While it is generally the case that an assault occurring during working hours, at the workplace, that "ar[ises] out of a discussion about office affairs" does not fall within the assault exception, Muhonen v. AT&T Inc., No. 09-CV-0452 (JRT/SRN), 2009 WL 3013530, *6 (D. Minn. Sept. 16, 2009) (citing Parker v. Tharp, 409 N.W.2d 915, 917 (Minn. Ct. App.1987)), aff'd, 456 Fed. Appx. 610 (8th Cir. 2012), cert. denied, __ S. Ct. __, No. 12-5122, 2012 WL 2847499, *1 (2012)), this Court held in Birth v. Myles, No. 09-CV-3386 (DWF/JSM), 2010 WL 5067488, *4-5 (D. Minn. Dec. 6, 2010), that the WCA did not preempt the plaintiff's tort claims even though the alleged assault and battery occurred during working hours and in the workplace. In Birth, the plaintiff alleged sexual harassment by her department manager, which occurred in the workplace, but also continued after the co-worker was fired – the plaintiff had seen the former co-worker parked outside of her apartment. 2010 WL 5067488, at *2. When the co-

worker was still employed, however, he had attempted to sexually assault the plaintiff. Id. at *1. The Court found that the alleged assault and battery was personally motivated and did not arise out of her employment activities, nor was this activity directed at all employees.[3] Id. at *4-5.

Plaintiff's assault claim, for the incident in November 2009 when LePlavy is alleged to have thrown a ruler at Radcliffe, does not fall within the assault exception to the WCA exclusivity provision. The event occurred in the workplace, during daytime hours, on the day following Thanksgiving. At least two other employees were working with Radcliffe on that day. (Compl. ¶ 25 [Doc. No. 1-1].) Plaintiff alleges that LePlavy threw the ruler in the context of reviewing a document on a large work project. (Id.) As in Parker and Muhonen, the ruler incident occurred at the workplace, during workplace hours and arose out of a discussion about workplace issues. Unlike Birth and Mehl, which involved allegations of sexual assault and battery, Plaintiff has not alleged that LePlavy threw the ruler because of personal animosity towards Plaintiff unrelated to her employment. And, while nothing indicates that LePlavy routinely threw rulers at all other employees, the allegations make clear that the incident was specifically related to Plaintiff's status as an employee, working on a large project, with a short deadline. (Compl. ¶ 25 [Doc. No. 1-1].) Accordingly, the assault exception to the WCA does not

---

[3] This Court has held that a sexual harassment action brought pursuant to the MHRA does not preempt a sexually-motivated common law battery claim. Mehl, 2012 WL 1593215 at *7 (citing Wirig v. Kinney Shoe Corp., 461 N.W.2d 374 (Minn. 1990)).

apply and Defendant's motion to dismiss Plaintiff's common law claims in Counts Six and Seven is granted.

## 2.    Preemption Under the MHRA

In addition, Defendant argues that Plaintiff's common law claims are subject to preemption under the MHRA.  Plaintiff asserts that her common law claims are not preempted.

The MHRA is the exclusive remedy for acts declared actionable by the MHRA. Minn. Stat. § 363A.04. "[T]he MHRA preempts a common law cause of action if: (1) the factual basis and injuries supporting the common law claim also would establish a violation of the MHRA; and (2) the obligations the defendant owes to the plaintiff, as a practical matter, are the same under both the common law and the MHRA."  Pierce v. Rainbow Foods Group, Inc., 158 F. Supp.2d 969, 975–76 (D. Minn. 2001).

While Plaintiff contends that the duties of care underlying her common law claims differ from those obligations underlying her MHRA claims, the Court disagrees. Applying Pierce, in Beliveau v. The Saint Paul Area Council of Churches, this Court held that the MHRA preempted the plaintiff's common law claims alleging negligence and negligent training, retention, and supervision, where none of the facts or injuries alleged in the plaintiff's common law claims fell outside the realm of protections under the MHRA.  No. 10-CV-3593 (DWF/JJK), 2010 WL 5422559, *3 (D. Minn. Dec. 23, 2010). The allegations here dictate the same result.  In Count Six, Radcliffe alleges negligent supervision and retention, and in Count Seven, IIED, based on her general factual

allegations, and allegations of a "continual pattern of discrimination and harassment" that caused Plaintiff to suffer severe emotional stress, trauma, embarrassment and depression. (Compl. ¶¶ 91-92; 96 [Doc. No. 1-1].)  Plaintiff further alleges in Count Six that Defendant was negligent in retaining LePlavy (id. ¶ 94), and, in Count Seven, that both LePlavy and Dr. Battis intentionally inflicted emotional distress upon her.  (Id. ¶ 100.)

Radcliffe's resulting "personal, emotional, and economic injuries" (id. ¶¶ 95, 100) are related to Defendant's duty to protect Plaintiff from harassment, discrimination, and retaliation in the workplace and fall within the MHRA's protections.  Accordingly, in addition to the exclusive remedy provision of the WCA, Plaintiff's common law claims in Counts Six and Seven are preempted by the MHRA.  Defendant's motion to dismiss Counts Six and Seven is therefore granted on this additional basis.

### 3.    Sufficiency of Common Law Claims

Finally, in addition to the WCA exclusive remedy provision and MHRA preemption, Defendant argues that Plaintiff's common law claims fail as a matter of law. Plaintiff argues that her claims are sufficiently pled.  Alternatively, she seeks permission to amend her Complaint if the Court finds that her allegations are insufficient.

### a.    Negligent Supervision and Retention Claim

Even if Plaintiff's negligent supervision and retention claim in Count Six was not preempted by the MHRA and the WCA, it would nevertheless be subject to dismissal on the merits.  Under a claim for negligent supervision or retention, an employer may be held directly liable for "an employee's intentional tort, an action almost invariably outside the

scope of employment, when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct." Yunker v. Honeywell, Inc., 496 N.W.2d 419, 422 (Minn. Ct. App. 1993); see also Ponticas v. K.M.S. Investments, 331 N.W.2d 907, 911 (Minn. 1983) (recognizing claim for negligent hiring and acknowledging Minnesota has recognized a claim for negligent retention). Applying Minnesota law, this Court has held that employment-based sexual harassment may form the basis for a claim of negligent retention. See Mandy, 940 F. Supp. at 1470–72 (D. Minn. 1996); Thompson v. Campbell, 845 F. Supp. 665, 676 (D. Minn. 1994). Harassment of a more general nature, however, has been found insufficient to sustain such a claim. Bruchas v. Preventive Care, Inc., 553 N.W.2d 440, 442–43 (Minn. Ct. App. 1996). Rather, the employee's conduct must rise to the level of an intentional tort. See id.; see also Thompson v. Olsten Kimberly Qualitycare, Inc., 980 F. Supp. 1035, 1040–41 (D. Minn. 1997) (dismissing claims of negligent supervision because plaintiff failed to allege that she suffered either physical injury or feared such injury).

Negligent supervision also requires an allegation of physical injury. Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007) (affirming judgment on pleadings for defendant). Moreover, such claims require the plaintiff to establish that the physical harm was reasonably foreseeable to the employer. See, id. at 278 ("[A] negligent hiring claim like a negligent supervision claim, requires that the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct.")

Plaintiff alleges that LePlavy's comments and conduct led to her deteriorating health and depression.  (Compl. ¶¶ 92, 95 [Doc. No. 1-1].)  Her general allegations also refer to the incident in which LePlavy threw a ruler at her, although she does not allege a direct physical injury as a result.   (Id. ¶ 25. ) While Plaintiff's allegation of depression might be considered a physical injury, and assuming that she may have had apprehension of physical injury during LePlavy's ruler-throwing incident, she has not alleged that Securian should have known that LePlavy had a propensity to cause physical harm.  Instead, she alleges that Securian knew or should have known of "problems with LePlavy after numerous employees under him reported his actions to human resources, with one citing him as the specific reason for her departure in her exit interview, in addition to requiring him to take a class to work and manage people better."  (Id. ¶ 93.)  These past reports from other employees may have described offensive behavior on LePlavy's part, but the Complaint fails to allege that the past complaints involved the use or threat of physical harm.   Moreover, the Complaint describes the class which LePlavy was allegedly required to attend as a "charm school" (id. ¶ 19), not a class on overcoming the physical abuse of employees.  In short, Plaintiff does not allege the type of intentional, physically injurious tort that courts deem necessary to create an actionable claim for negligent supervision and retention.  Accordingly, Plaintiff's claim for negligent supervision and retention fails on the merits, as well as for the reasons previously identified.  Defendant is entitled to the dismissal of this claim.

### b.     IIED Claim

Regarding Radcliffe's claim for IIED in Count Seven, a person asserting a claim for IIED must establish the following four elements:  (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe.  Hubbard, 330 N.W.2d at 438-39 (citing Restatement (Second) of Torts § 46(1) (1965)).  This claim is limited to the most egregious facts, in situations in which the defendant's conduct is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Id. at 439 (citation omitted).   Thus, "[l]iability for intentional infliction of emotional distress does not extend to insults, indignities, threats, annoyances, petty oppressions, or trivialities."  Langeslag v. KYMN, Inc., 664 N.W.2d 860, 865 (Minn. 2003) (citations omitted).  Verbal harassment by a supervisor also falls short of the type of egregious conduct necessary to maintain a claim.  Schibursky v. Int'l Bus. Machines Corp., 820 F. Supp. 1169, 1183 (D. Minn. 1993); see also Onyiah v. St. Cloud State Univ., 655 F. Supp.2d 948, 970-72 (D. Minn. 2009).

Plaintiff fails to allege conduct sufficiently extreme and outrageous to support such a claim.  She contends that LePlavy was generally disrespectful and threw a ruler at her. (Compl. ¶¶ 21, 25, 28 [Doc. No. 1-1].)  While such allegations certainly describe unprofessional, objectionable conduct, these actions do not satisfy the requirement of extreme and outrageous conduct necessary to maintain a claim for IIED.  Morever, as Defendant notes, while LePlavy allegedly engaged in such behavior, he consistently rated

Radcliffe's work performance as "exceed[ing] expectations" and Defendant regularly promoted Radcliffe. (Id. ¶¶ 1, 23.)

As to Dr. Battis and the allegations of involuntary commitment, Plaintiff alleges that after she met with Battis on August 16, 2010, he consulted with Radcliffe's general physician by phone. (Id. ¶ 38.) Dr. Battis then summoned his assistant and the two drove Plaintiff to United Hospital. (Id.) Plaintiff alleges that she was placed on a 72-hour mental health lockdown and subjected to a strip search. (Id.) As Defendant notes, however, Plaintiff does not allege that Dr. Battis actually admitted Plaintiff to the hospital, that he searched her, or that the hospital misdiagnosed her as a threat to herself or others. (Def.'s Reply Mem. at 13 [Doc. No. 23].) In Hempel v. Fairview Hosp. & Healthcare Servs., Inc., 504 N.W.2d 487, 492-93 (Minn. Ct. App. 1993), the Minnesota Court of Appeals held that the actions of medical staff in undertaking a necessary procedure that could be conducted safely, although it led to the patient's death, did not constitute extreme and outrageous conduct. In Hempel, the plaintiffs were the parents of an adult psychiatric patient, who died from cardiac arrest during a psychiatric "take down" procedure in the hospital, which the parents witnessed. Id. at 489. The court found that while witnessing their son's death was undoubtedly distressing, the fact that the patient's sweatshirt was pulled over his head during the take down procedure, and that the "team leader" of the psychiatric attendants did not provide appropriate reassurance to the patient, were actions not so "utterly intolerable" as to sustain a claim for IIED claim. Id. at 493. Here also, while Plaintiff clearly found the incident involving the mental

health ward upsetting, the actions of Dr. Battis and his assistant in transporting Radcliffe to the hospital after consulting with her personal physician do not qualify as behavior "utterly intolerable to the civilized community." Id.

### c. Leave to Amend

Finally, Plaintiff seeks leave to amend her Complaint. (Pl's Opp'n Mem. at 27 [Doc. No. 22].) The Court, however, finds that because Plaintiff has failed to satisfy the statute of limitations with respect to the allegations at issue in Counts Two through Five, permitting leave to amend would be futile as to those claims. Thunander v. Uponor, Inc., __ F. Supp.2d __, No. 11-CV-2322 (SRN/SER), 2012 WL 3430749, *24 (D. Minn. Aug. 14, 2012) (denying leave to amend particular claims that were time-barred under statutes of limitation on grounds of futility). In addition, as set forth herein, the Court finds that permitting leave to amend Plaintiff's common law claims in Counts Six and Seven would be similarly futile, because they are preempted by both the WCA, the MHRA, and fail on the merits. The deficiencies in the pleading are therefore not mere technicalities, for which leave to amend might be appropriate to cure such deficiencies. See Eller v. Nat'l Football League Players Ass'n, __ F. Supp.2d __, No. 11-CV-2623 (SRN/JJG), 2012 WL 1933746, *12 (D. Minn. May 29, 2012) (denying, as futile, permission for leave to amend where claims failed as a matter of law). Finally, Plaintiff articulates no additional or different allegations or claims that she would make. Id. (citing In re NVE Corp. Sec. Litig., 527 F.3d 749, 752 (8th Cir.2008) (affirming dismissal with prejudice where "appellants have not articulated any changes they wish to make, much less demonstrated

how revision would address the numerous pleading deficiencies identified by the district court"). The Court therefore denies the request for leave to amend.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant's Partial Motion to Dismiss [Doc. No. 16] is **GRANTED**, such that those portions of Counts Two through Five which fall outside of the statute of limitations are dismissed, and Counts Six and Seven are dismissed in their entirety.


Dated:    October 30, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge